156 January 10, 2024 No. 19

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRANDON DALE MORGAN,
*Defendant-Appellant.*

Linn County Circuit Court
20CR28046; A176395

Brendan J. Kane, Judge.

Argued and submitted September 26, 2023.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

**JOYCE, J.**

Defendant appeals from his convictions for first-degree sodomy and first-degree attempted sexual abuse. Defendant assigns error to the trial court's rulings admitting evidence that defendant altered a polygraph report and statements he made to the polygrapher after the test. We review the trial court's determination that evidence stemming from a polygraph examination is admissible for errors of law, *see State v. Harberts*, 315 Or 408, 417, 848 P2d 1187 (1993), and reverse. That conclusion obviates the need to address defendant's remaining claims of error.

## BACKGROUND FACTS

We take the facts, which are undisputed, from the testimony at the hearing on the motion *in limine*. In 2019, M reported that defendant had sexually abused her. In an effort to convince his parents of his innocence, defendant hired an independent consultant, Fairall, to conduct a polygraph examination following M's disclosure. Fairall is a retired detective who owns a polygraph business. In October 2019, Fairall conducted the polygraph exam. During the exam, Fairall asked defendant three questions about the alleged conduct: "Did you sexually abuse [M]?"; "Have you ever sexually touched [M]?"; and "Are you concealing touching of [M's] genitals for sexual reasons?" Defendant answered no to all three questions, and all three answers indicated deception.

After completing the exam, Fairall spoke with defendant and offered to help him self-report to the Department of Human Services "if there was some mistake [he] made in the past." Defendant declined, explaining that he did not want to get the authorities involved unless his family wanted them involved. Fairall drafted a report explaining that defendant's answers displayed a "significant response" and that there was "deception indicated." Fairall emailed a copy of the report to defendant. Defendant altered that copy of the report, adding the word "no" in front of "deception indicated" on the three conduct-related questions that he had failed, thus making it look as though the polygraph indicated that he had answered all of the questions truthfully. Defendant then emailed a copy of the altered report to his mother.

Approximately a month later, defendant's mother called Detective Lacy-White, who was investigating M's claim of sexual abuse, requesting an update on the investigation. She informed Lacy-White that defendant had voluntarily taken a polygraph on his own and passed. Defendant's mother then emailed Lacy-White a copy of the polygraph report given to her by defendant. A few weeks later, Lacy-White interviewed defendant. During that interview, defendant stated that he had taken a polygraph and passed.

After she interviewed defendant, Lacy-White contacted Fairall to discuss defendant's exam and results. During that phone call, Lacy-White and Fairall came to believe that the polygraph report that defendant's mother had given to the police had been substantially altered from the original. Lacy-White sent Fairall a copy of her version of the report, which he reviewed. Fairall noticed that the answers in the report from Lacy-White had been changed by adding the word "no" in front of "deception indicated," thus making it look as though defendant had answered all the questions truthfully. Fairall then sent Lacy-White the original version of the report, which showed that defendant had failed.

Before trial, the state filed a motion *in limine* to admit evidence that defendant had significantly altered the polygraph report to show that he passed the exam. The state argued that defendant changing the answers on the report was probative of defendant's consciousness of guilt—that is, that defendant knew that, as the polygraph had indicated, he had answered the questions untruthfully, and that his knowledge that he had answered the questions untruthfully and his knowledge that the polygraph had correctly indicated that he had answered the questions untruthfully had motivated him to alter the report to hide the truth. Defendant objected, asserting that any evidence about the report was impermissible polygraph evidence and its admission would violate his due process rights.

The trial court heard testimony from detectives, Fairall, and defendant's mother. The state also offered the questions that it intended to ask Fairall at trial, omitting

any mention of the polygraph exam itself. The proffered questions included:

- whether he had a history in law enforcement;

- whether he independently consulted on cases for defense attorneys and citizens;

- whether defendant had hired him as an independent consultant "in relation to some sex abuse allegations against him";

- whether he asked defendant questions about those allegations and prepared a report;

- whether he provided defendant with the report;

- how the report was originally sent to defendant;

- how the report had subsequently been altered;

- whether the report had been altered in such a way that would suggest that defendant was "less likely to have committed the crime"; and

- the circumstances of his offering to help defendant report any misconduct and defendant's response.

The state argued that Fairall's testimony that defendant had altered the report was admissible because references to the polygraph were omitted and the probative value of the evidence to show defendant's consciousness of guilt would outweigh any prejudicial impact. Defendant, in contrast, argued that admission of the evidence would infringe on defendant's due process rights because he would not be able to cross-examine Fairall without bringing in reference to the polygraph.

The court granted the state's motion to admit Fairall's testimony, concluding that it was probative of defendant's state of mind:

"it was [defendant] who initiated *** this report for whatever reason he wanted and then allegedly altered said report, the subject matter of which is clearly probative for a jury to determine whether or not the offense occurred, not based on the results of the test, but based on the state of mind."

At trial, the state also sought to admit an edited version of the polygraph exam video, in which Fairall offered to help defendant self-report to the authorities and explain his conduct. The recording reflected defendant and Fairall's conversation immediately following the polygraph exam:

"[FAIRALL]:   So I'll just put this out there to you. My report, of course, will only go to you, only be sent to that address, but if there is something that has happened that took place in the past, and I'm sure if something did happen it doesn't reflect who you are, it was just some mistake that got made, I do have quite a few connections with Department of Human Services and law enforcement, and if I could help you out by maybe helping you to explain something, I'd be more than happy to do that.

"[DEFENDANT]:   Okay. (inaudible). I was told it went to DHS, but I don't know, maybe the teacher didn't report it to DHS and just talked to the mother, but either way yeah, 'cause the way it is now, the—the mother's just saying she's going to handle it and not—she doesn't want DHS involved because everyone in the family (inaudible) is what she told me. So I don't really want DHS involved unless they want them involved.

"[FAIRALL]:   Well what I would tell you is, I understand that way of thinking completely, but there is a loose end and the statute of limitations in Oregon is very long.

"[DEFENDANT]:   Mmm-hmm.

"[FAIRALL]:   And the loose end being your niece, and so she could continue to talk about these memories. Eventually, you know, if she mentions it, it will get reported and investigated.

"[DEFENDANT]:   Mmm-hmm.

"[FAIRALL]: And it would be in your best interest to get ahead of it and rather than, you know, if there was some mistake you made in the past, go ahead and get it out yourself rather than have it being brought out by having her interviewed.

"[DEFENDANT]:   Mmm-hmm.

"[FAIRALL]:   And so I remember a number of, you know, incidents where a man did make some mistake and they proactively reported it themselves, they came out

looking a lot better. And there was—because they did they were often handled in, you know, a more reasonable means than if this had all come from the child, just based on the child's disclosures. So something to think about.

"[DEFENDANT]:   Okay.

"[FAIRALL]:   Okay?

"[DEFENDANT]:   Mmm-hmm."[1]

Defendant objected, arguing that if the state were allowed to introduce a portion of the conversation between Fairall and defendant, then he should be able to introduce evidence that he had denied the conduct. The court admitted the video evidence and allowed defendant, if he so chose, to ask Fairall whether defendant denied the conduct.

At trial, Fairall, consistent with his pretrial testimony, testified that he interviewed defendant in relation to the allegations against him and drafted a report of that conversation, which he provided to defendant as an attachment to an email. He explained that he learned sometime later that defendant had used the report to attempt to convince others that he had not committed the crime. He further explained that the report had been altered significantly but that the alterations would not be obvious to someone who had not conducted the interview.

Fairall also testified about his recorded conversation with defendant, prior to the jury seeing the video. He explained that at the end of the conversation with defendant, he suggested that he could help defendant report any misconduct. He stated that defendant responded that he did not want to report anything. The prosecutor then asked Fairall to describe what defendant was "physically *** doing with his head" during that conversation, to which Fairall said defendant was nodding. The state then played the video to the jury.

Defendant testified that he denied the conduct in conversations with his parents and with Lacy-White. He explained that he met with Fairall, received a report from

---

[1]  Fairall had previously testified during the motion *in limine* hearing that defendant "sat nodding his head the entire time" while Fairall explained the results and talked to defendant.

him, and altered it because he "didn't believe in the opinion that was stated on it."

A jury convicted defendant of both charges. On appeal, defendant challenges the trial court's rulings allowing Fairall to testify about the altered polygraph report and the interview, and in admitting defendant's statements—including defendant's non-verbal communication (nodding)—in the video.

## LEGAL DISCUSSION

Oregon courts have long held that polygraph examination results are inadmissible. *State v. Brown*, 297 Or 404, 445, 687 P2d 751 (1984) (holding that polygraph evidence is inadmissible in any legal proceeding subject to the Oregon Evidence Code); *see also State v. Lyon*, 304 Or 221, 233-34, 744 P2d 231 (1987) (concluding that polygraph test results are inadmissible even where admissibility has been stipulated to by the parties).

That is because, despite any potential relevancy of polygraph exam results, the probative value of a polygraph is far outweighed by other reasons for exclusion under the Oregon Evidence Code. *Brown*, 297 Or at 442 ("[W]e conclude that the probative value of polygraph evidence is far outweighed by reasons for its exclusion."); *Lyon*, 304 Or at 233-34 ("The same considerations that compelled us to conclude in *Brown* that polygraph results are inadmissible over the objection of either party compel us now to conclude that polygraph evidence is inadmissible for any purpose in any legal proceeding subject to the rules of evidence."). In *Brown*, the court explained that polygraph evidence—which purports to reflect whether a person is telling the truth—"may well divert the trier of fact" and, indeed, interfere with "the very essence of the jury's role" to determine the truth. 297 Or at 440-41. In addition, jurors are apt to overvalue the significance and reliability of polygraph results, and to defer to results that may not be reliable or accurate. For those reasons, while polygraph results have at least some probative value and scientific basis, they are categorically inadmissible under OEC 403 to prove the "truth of the matter

asserted" *i.e.*, to prove the truth of the polygraph results. *Harberts*, 315 Or at 414.

Thus, the general rule is that "when introducing statements made by a defendant in conjunction with a polygraph examination, [the state] may not introduce evidence that the statements were made in the context of a polygraph examination or details of the polygraph examination." *Id.* at 413.

That said, when the issue in the case for which the polygraph evidence is being offered is entirely independent of the questions that were the subject of the polygraph, the evidence may be admissible. *See id.* at 414. For example, in a dissolution case involving allegations of child abuse, the Supreme Court held that polygraph results *could* be admissible if offered to show its effect on a party's state of mind. *Fromdahl and Fromdahl*, 314 Or 496, 508, 840 P2d 683 (1992). In that case, the mother sought to introduce the father's failed polygraph results to rebut the father's argument that the mother was not acting in the best interest of their children. *Id.* The mother argued that the polygraph report and testimony about her knowledge of its conclusions were relevant to show its effect on her state of mind, supporting her contention that she responded rationally and appropriately based on the information available. *Id.* The court ruled that the polygraph test was admissible:

> "[C]onsidering the context in which this case developed and the reason for which mother offered the polygraph evidence, we conclude that the trial court erred in sustaining father's objection to the polygraph report and mother's testimony about her knowledge of the report's conclusion on the ground that, without exception, polygraph evidence is never admissible in an Oregon court. Given the particular purpose for and the narrow context in which it was offered, mother's evidence was admissible."

*Id.* at 508.

In *Harberts*, the court expanded on its previous articulations of when polygraph evidence is admissible, creating a two-part test for determining whether a defendant's statement made during or related to the administration of a polygraph or its results is admissible. 315 Or at 415-17.

There, the state sought to offer incriminating statements that the defendant had made before, during, and after a polygraph. *Id.* at 411-13. The court began by observing the general rule that the state, "when introducing statements made by a defendant in conjunction with a polygraph examination, may not introduce evidence that the statements were made in the context of a polygraph examination or details of [that] examination." *Id.* at 413. Yet, statements made by a defendant during or in conjunction with a polygraph *could* be admissible where two requirements were met. First, the defendant's statement must "express[] the defendant's belief or recollection as to an independently relevant fact (for example, as to the circumstances of the crime) or support[] an inference as to such a belief or recollection." *Id.* at 415. By way of example, a defendant's statement does not express the defendant's belief or recollection as to a relevant independent fact if the defendant's statement "repeats information from or about the exam," "expresses a belief in the truthfulness" of the polygraph interpretation, or "states a belief in the general accuracy of polygraph exam[s]." *Id.* at 415 n 10. If the statement does not meet that standard, the evidence is not admissible. *Id.* at 415-16.

Second, the statements are admissible only if they "can be redacted to exclude any reference to the polygraph examination without significantly altering the meaning of the original statement in the context in which it was made." *Id.* at 416-17. If the meaning of the defendant's statement can still be accurately conveyed when references to information from or about the polygraph are omitted, it may be admissible. *Id.* at 417. But, if the meaning of the defendant's statement "is * * * inextricably tied to the fact of, or information from or about, the polygraph examination," then the meaning cannot be retained if altered. *Id.* at 418. For a statement to be adequately redacted, it must be done "without significantly altering the meaning of the original statement in the context in which it was made." *Id.* at 416-17. Further, if the alteration causes "whatever probative value the statement retains" to be "'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,'" then it is subject to exclusion under OEC 403. *Id.* at 417 (quoting OEC 403).

With that factual and legal background in mind, we turn to the evidence at issue here. Defendant contends that Fairall's testimony about the altered report and his statements to Fairall immediately following the examination are inadmissible under *Harberts*, both because the evidence is not independently relevant and because Fairall's testimony and the video clip were not adequately redacted under *Harberts*.[2] The state contends that the polygraph evidence has independent relevance because it shows defendant's consciousness of guilt.

We begin with Fairall's testimony about the altered report, namely, that he prepared a report, and that the report was later altered in a way to make it appear less likely that defendant had committed the crime. As a threshold matter, we note that we understand that testimony to relate to conduct by defendant—altering the report and presenting the altered report to others—that, for present purposes, is a statement. *See* OEC 801(1)(b) ("statement" includes "[n]onverbal conduct of a person, if intended as an assertion"); *see also State v. Moala*, 320 Or App 33, 39, 511 P3d 1127 (2022) (citing cases demonstrating that nonverbal conduct can be a statement).

In *Harberts*, the court provided an example of when a statement can be both independently relevant and adequately redacted. That example provides a helpful lens through which to view Fairall's testimony and we thus start there. The court contrasted two statements of a hypothetical defendant when faced with information about a polygraph that indicated deception:

- "I knew I shouldn't have agreed to take this polygraph test; I guess I can't trick that machine after all; I committed the crime."

- "I still can't remember a thing, but I know that polygraph examinations are never wrong; this polygraph examination showed that I was deceptive when I denied committing the crime; therefore, even though I don't remember, I suppose I committed the crime."

---

[2] The state contends that defendant did not preserve his argument that the evidence could not be adequately redacted. We have reviewed the record and conclude that defendant preserved this argument.

*Harberts*, 315 Or at 418. The court went on to observe that, while both statements share the phrase "I committed the crime," "the meaning of those four words is different and is determined by the context." *Id.* The court explained that the first step in determining admissibility is to "determine[] whether the statement may be properly found to express a defendant's belief or recollection as to an independently relevant fact or to support an inference as to such a belief or recollection." *Id.* The second step is to "attempt[] to redact each statement" without altering the meaning. *Id.*

The court noted that the first response "is a confession"—and thus has independent relevance—and could be redacted to exclude the references to polygraph without altering its meaning. *Id.* In contrast, the second is a statement of "a belief in the general accuracy of polygraph examinations and, implicitly, a repetition of the information from or about the polygraph examination." *Id.* And the second statement was "so inextricably tied to the fact of, or information from or about, the polygraph examination that the meaning cannot be retained when the context and explicit reference to the polygraph are excluded." *Id.*

Fairall's testimony adheres more closely to the second example. That is, the state sought to use the evidence to establish that defendant had received a report and had altered it to make it appear less likely that he had committed the crime. It may be, as the state argues, that a jury would conclude that those actions reflect consciousness of guilt—that is, that the jury would infer that defendant knew that, as the polygraph had indicated, he had answered the questions untruthfully, and that his knowledge of his untruthful responses and his knowledge that the polygraph had indicated that he had answered the questions untruthfully had motivated him to make the statement that he did, by altering the report to hide the truth. But that alone does not satisfy the *Harberts* test; indeed, a defendant's statement related to a failed polygraph test will almost always allow an inference of consciousness of guilt.

*Harberts* requires that the probative value of a statement be able to be understood independently of a polygraph, but also that it can be redacted to remove references

to the polygraph without removing the meaning of the evidence. *Id.* at 415-18. Fairall's testimony does not meet that standard. That is because his testimony about defendant altering the report to make it look less likely that he had committed the crime is "so inextricably tied to the fact of, or information from or about," the polygraph that the meaning of that evidence cannot be fully understood when references to the polygraph are stripped out. *Harberts*, 315 Or at 418. That is, as defendant observes, his conduct in altering the report is "only relevant in relation to the contents of the report—either he believed it was accurate and wanted to hide the results, or he believed [that] it was inaccurate[,] but that other people would think it was accurate. Either way, the only relevance *** was in relation to the [polygraph] report." We therefore conclude that the trial court erred in allowing Fairall's testimony. We further conclude that, given the nature of the evidence, the error was not harmless.

Having so concluded, we are left with the remaining evidence, which is the video of the post-polygraph conversation between Fairall and defendant. Its admission was tied to admission of Fairall's testimony about the report and its alteration. At this point, it is unclear whether the state on re-trial would seek to admit the video of that conversation and whether, in light of the fact that Fairall's testimony about the report is inadmissible, that conversation would have independent relevance. Given our conclusion that the key testimony is inadmissible, the circumstances will be different enough on remand that our resolution of this issue in its current posture is not necessary.

Reversed and remanded.